IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| KENDALL PRICE | : | NO. 11-630 |

M E M O R A N D U M

GENE E.K. PRATTER, J.                                                                                                            JANUARY 4, 2012

**INTRODUCTION**

Kendall Price, indicted on one count of being a convicted felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1), moves to suppress from the evidence to be offered at his trial the loaded gun seized from him by undercover narcotics officers on March 4, 2011. Because the Court concludes that the seizure was lawful, Mr. Price's motion will be denied.

**BACKGROUND**[1]

Philadelphia law enforcement officers Corey Smalls and Bryan Outterbridge were on plainclothes back-up and surveillance duty, parked in an unmarked car in a fast food restaurant parking lot on March 4, 2011. This particular parking lot was known as a location of illegal narcotics transactions in an area of Philadelphia recognized as a high crime area. The officers' assignment that day stemmed from an ongoing law enforcement effort unrelated to the events at issue here. The two officers were experienced in narcotics law enforcement efforts.

At approximately 6 p.m., Kendall Price drove into the parking lot, parked his car and entered the passenger side of another car, a Nissan Maxima, that was parked immediately next to

---

[1] Unless specifically noted otherwise, this factual recitation comes from the evidence presented during the hearing conducted in this matter on December 9, 2011.

the officers' unmarked car.  The driver of the car that Mr. Price entered was recognized by one of the undercover officers as a known narcotics dealer in the locale.  Mr. Price was not in the Nissan for long.  When he got out of the car, he did not go into the restaurant, but rather headed back to his own car.

At roughly this same time, the police officers received a "flash" communication relating to the investigation that was the actual focus of their back-up readiness, and they began to attend to those duties as their immediate priority.  They pulled out of their parking space and began to drive through the parking lot to the exit when, for unknown reasons, they received a follow-up radio alert to disregard the "flash" transmission.  Hence, the officers decided to return to their prior parking slot and, in doing so, had occasion to refocus on Mr. Price who was in the process of walking back to his car from the Nissan.  Officer Outterbridge, in the passenger seat in the officers' car, saw a bulge on Mr. Price's person that the officer surmised may have been a gun, prompting him to say to his partner, Officer Smalls, that the man they were observing, *i.e.*, Mr. Price, appeared to have a gun.  Officer Outterbridge suggested they stop him.

The officers advanced to Mr. Price's car (into which Mr. Price had just entered), got out of their car and began to approach him.  As they did so, the officers were wearing their badges around their necks, and Officer Smalls identified themselves as police officers and instructed Mr. Price to raise his hands.  Mr. Price, according to the officers' recollection, turned in his seat to look at the approaching officers, appeared to lean back and made a reaching motion toward his waistband.  In short order, Officer Smalls opened the driver's side door of Mr. Price's car, and Officer Outterbridge opened the passenger's door, also asking Mr. Price as the car's sole occupant what he was reaching for.  The reply from Mr. Price was that he had a gun.  Events continued to move swiftly.  Upon Mr. Price getting out of his car, the officers grabbed Mr.

2

Price's hand, recovered and cleared the gun, placed him in handcuffs, conducted a pat-down search of Mr. Price during which a small amount of narcotics was found, and then guided Mr. Price into a recently arrived police car for transportation to the station.  The entire police interaction from sighting Mr. Price initially to getting him into the police car occurred over the span of approximately ten to twelve minutes or less according to the officers' recollections.

**DISCUSSION**

In his quest to suppress the evidence of his alleged crime, *i.e.*, the gun, Mr. Price labors mightily to parse the fast-moving events into artificial snap shot scenes in bits of time, as if by doing so he can change the outcome of the whole drama overall.  He cannot.  The simple scenario described by the credible and consistent testimony of the officers of the events of March 4, 2011 demonstrates that the officers saw Mr. Price engage in conduct of which, by reason of the location, the other participant, the reputation of the general locale, and the actual actions of Mr. Price, the officers were wary as possible illegal drug transactions.  They observed Mr. Price join and then quickly depart from the company of a known narcotics dealer and then saw a suspicious bulge in Mr. Price's waistband; they saw him reach toward his waistband as they approached him in his car, having identified themselves as police officers; and, finally, Mr. Price stated he did indeed have a gun.  However these observations may have been interpreted by experienced law enforcement personnel, the officers' seizure of the loaded semi-automatic pistol from Mr. Price was lawful and did not run afoul of the Fourth Amendment.

The Court concludes that Officers Smalls and Outterbridge, consistent with Terry v. Ohio, 392 U.S. 1 (1968), given their on-site observations, their knowledge of the setting and their general law enforcement experience, had reasonable suspicions on the basis of which they could detain Mr. Price and then seize his firearm.  Indeed, once Mr. Price reached toward his

3

waist—especially given, but not only because of, his statement to the officers that he had a gun—the officers were entirely authorized under Terry to seize the gun to remove the danger and risk of physical harm to themselves and to the fast food restaurant patrons without first frisking Mr. Price. Terry, 392 U.S. at 24. And, finally, given all of the foregoing, once these events transpired, the officers had sufficient probable cause to proceed as they did. The officers had reasonable suspicions that justified stopping Mr. Price in a known high-crime area, and having observed him interact with a known drug dealer and seeing a bulge in his clothing, they saw him reach toward his waistband and heard him say that he had a gun. Given these circumstances, practical common sense law enforcement decision-making allows for these officers to conclude they had probable cause to believe that some crime was afoot and that it involved Mr. Price. See, e.g., Maryland v. Pringle, 540 U.S. 366, 370-71 (2003); United States v. Rickus, 737 F. 2d 360, 366 (3d Cir. 1984). Thus, the Court concludes that Officers Smalls and Outterbridge were well within constitutional boundaries when they seized the gun from Mr. Price and then proceeded to arrest him. See, e.g., Rawlings v. Kentucky, 448 U.S. 98, 110-11 (1980).

**CONCLUSION**

Accordingly, the Court finds that Mr. Price's suppression motion must be denied, as reflected in the Order accompanying this Memorandum.

        BY THE COURT:

        /s/ Gene E.K. Pratter
        GENE E.K. PRATTER
        United States District Judge